Accordingly, defendant Paxson Machine Company's motion for summary judgment will be granted.

UNITED STATES of America

v.

E. Wharton SHOBER, George L. Guerra, John P. Dixon.

Crim. No. 78–312.

United States District Court,
E. D. Pennsylvania.

Sept. 26, 1979.

Frank H. Sherman, Peter J. Smith, Asst. U.S. Attys., Philadelphia, Pa., for plaintiff.

Richard A. Sprague, Joan A. Zubras, James C. Schwartzman, J. Shane Creamer, Philadelphia, Pa., for defendants.

## MEMORANDUM AND ORDER

TROUTMAN, District Judge.

*If proven at trial,* the allegations in the above captioned indictment will establish the following mail fraud and bribery scheme perpetrated in connection with the financing and construction of an addition to the Hahnemann Medical College and Hospital (Hahnemann) in Philadelphia. To obtain a federal grant for partial funding of the Tower Project, as the proposed addition became known, Hahnemann submitted to the federal government an appropriate application, which was officially pending before Congressman Daniel J. Flood, a member of the House Appropriations Committee and chairman of the subcommittee for Labor Health Education and Welfare, during the spring and summer of 1974, when defendant E. Wharton Shober, president of

Hahnemann, gave the Congressman a bribe of ten thousand dollars to influence his decision. (Count Eighteen). Defendant Shober also made and later consummated an agreement with the Congressman's administrative assistant, Stephen B. Elko. In exchange for Elko's use of his position and influence to obtain favorable consideration of Hahnemann's pending application, Shober agreed to use his position and influence as president of Hahnemann to effect selection of two designated firms,[1] Capital Investment Development Corporation (CIDC) and Environmental Design Center, Inc. (EDCI), as project monitor for the Tower Project. (Count One, ¶¶ 24, 28).

Defendant George L. Guerra was president of CIDC, a building construction and real estate development company; defendant John P. Dixon was an investor in EDCI, which provided architectural and engineering services.

Guerra and Dixon agreed to pay Elko cash kickbacks in exchange for Elko's use of his position and influence to obtain the coveted contract as project monitor. (Count One, ¶ 23). Thereafter, Guerra and Dixon gave Elko a twenty thousand dollar bribe. (Count One, ¶ 29, Count Nineteen).

All three defendants then acted alone or in concert to bring these plans to fruition. Defendant Shober directed Hahnemann's attorney, Laurence Corson, to compile data justifying selection of EIDC/CIDC as project monitor to Hahnemann's Board of Trustees, officers and administrators. (Count One, ¶ 25). To create a facade of fairness, impartiality and regularity, Shober further directed Corson to undertake a deceptive and fraudulent bidding procedure for the contract by inviting and receiving bids from Turner Construction Company and Morse/Diesel, Inc., with full knowledge that EIDC/CIDC's selection had been predetermined. (Count One, ¶ 26). Shober also negotiated a termination settlement with Morse/Diesel, Inc., on the existing management services contract. (Count One, ¶ 27). Finally, Shober and Guerra sent various letters through the mail, beginning in the summer of 1974 and continuing through the spring of 1976, to complete their artifice. (Counts One through Seventeen).[2]

The government charges that these schemes violated 18 U.S.C. § 1341 and § 2 (mail fraud and aiding and abetting) and 18 U.S.C. § 201 and § 2 (bribery and aiding and abetting)[3] and defrauded Hahnemann,

---

1. At all time relevant to this indictment, CIDC and EDCI were merged for the purpose of obtaining business, including the contract as project monitor for the Hahnemann Tower Project. (Count One, ¶ 10).

2. Count One, ¶ 30, involves a letter from Richard C. Spang to E. Wharton Shober, July 25, 1974. (Defendant Guerra is not named in this paragraph).
 Count Two involves a letter from Richard C. Spang to E. Wharton Shober, August 16, 1974. (Defendant Guerra is not named in this count).
 The remaining counts involve the following letters:
 Count Three, from George L. Guerra to E. Wharton Shober, May 1, 1975;
 Count Four, from George L. Guerra to E. Wharton Shober, May 21, 1975;
 Count Five, from Laurence Corson to George L. Guerra, July 15, 1975;
 Count Six, from Laurence Corson to George L. Guerra, October 21, 1975;
 Count Seven, from A. T. McNeill to E. Wharton Shober, October 29, 1975;
 Count Eight, from E. Wharton Shober to Harold Schiff, November 6, 1975;

Count Nine, from E. Wharton Shober to Harold Schiff, November 26, 1975;
Count Ten, from Laurence Corson to A. T. McNeill, November 26, 1975;
Count Eleven, from George L. Guerra to Laurence Corson, December 1, 1975;
Count Twelve, from George L. Guerra to Eiloerg, Corson, Getson & Abramson, December 8, 1975;
Count Thirteen, from Laurence Corson to Martin W. Spector, January 26, 1976;
Count Fourteen, from Laurence Corson to LeRoy E. Perper, April 9, 1976;
Count Fifteen, from E. Wharton Shober to William Fishman, May 25, 1976;
Count Sixteen, from Harold Schiff to E. Wharton Shober, October 30, 1975;
Count Seventeen, from Harold Schiff to Douglas MacArthur, November 20, 1975.

3. Specifically, defendant Shober is charged with mail fraud and aiding and abetting in Counts One through Seventeen and with bribery in Count Eighteen. Defendant Guerra is charged with mail fraud and aiding and abetting in Counts One, Three through Seventeen and with bribery and aiding and abetting in

the federal government, the Community Services Administration (an anti-poverty agency funded through annual Congressional appropriations), the Hospital Authority of Philadelphia (a corporation which owns, operates and leases hospitals), investors in its gross revenue bonds issued and sold to help finance the Tower Project, Turner Construction Company and Morse/Diesel, Inc., by denying them the right to have their business affairs conducted honestly and impartially and "free from deceit, craft, corruption, fraud, undue influence, conflict of interest and bribery". (Count One, ¶ 22).

■ Defendant Shober filed nineteen pre-trial motions; defendant Dixon five; the government four.[4] To resolve certain factual issues raised by three pre-trial motions, defendant Shober moves for the scheduling of an evidentiary hearing. First, defendant claims that a prosecutor's unfettered discretion to decide whether the government should proceed against an accused by indictment (and then arrest) or arrest (and then a subsequent preliminary

examination) violates his constitutional guarantees of due process and equal protection. If the latter course is followed, he complains, the defendant receives an array of significant procedural rights not available if the grand jury indicts him. He may personally appear and confront and cross-examine government witnesses; he may present exculpatory evidence and have a lawyer assist him. A magistrate, a court officer with legal training, will determine whether probable cause exists. Without objective standards the government arbitrarily can deny some defendants rights afforded to others in either of two ways. That is, the prosecutor can simply institute the matter by grand jury indictment or he can proceed by arrest and before ten days elapse, when the accused becomes entitled to a preliminary examination, obtain a grand jury indictment.

Defendant Shober seeks an evidentiary hearing to establish the fact that neither the Department of Justice nor the United States Attorney's office in this district have

---

Count Nineteen. Defendant Dixon is charged with mail fraud and aiding and abetting in Counts One through Seventeen and with bribery and aiding and abetting in Count Nineteen.

4. All such motions were joined in by the remaining defendants for a total of over seventy motions. By order of the Court denied, with several minor exceptions, the following Shober motions: for relief from misjoinder and for a severance, for leave to depose Laurence Corson and Stephen B. Elko, to require the government to produce material which will provide defense counsel access to certain witnesses and to produce witnesses who are effectively in government custody, to compel the government to grant immunity to prospective witness Daniel J. Flood or for alternative relief for a bill of particulars, to require inquiry under 18 U.S.C. § 3504 as to electronic or mechanical surveillance and to require the government to affirm or deny its existence in this case (moot), for discovery (denied in part and granted in part) to strike matter as surplusage, to require the government to produce all material submitted *in camera* for inspection by the defendant, to call additional witnesses during the evidentiary hearing and for leave to file a motion attacking the constitutionality of the bribery statute. The Court granted Shober's motions to join in defendant Dixon's motions and for an order requesting transmittal of a certified copy of the file in *United States v. Daniel J. Flood*, No.

78–543 (D.D.C. filed October 12, 1978) and *United States v. Stephen B. Elko*, No. 77–739 (C.D.Cal. filed June 9, 1977).

By order the Court also denied the following Dixon motions: for psychiatric examination of Stephen B. Elko, to compel the government to grant immunity to prospective witnesses Richard Fox, Daniel Flood and Edward Dixon, for discovery, for relief from prejudicial joinder and for disclosure pursuant to 18 U.S.C. § 3504 (moot). The Court granted Dixon's request to join in defendant Shober's motions.

Although defendant Guerra filed no motions, he did join in defendant Shober's motion to dismiss the indictment, or in the alternative, to grant defendant a post-indictment preliminary hearing. At the evidentiary hearing held in September 1979 Guerra orally joined in the other defendants' motions.

The Court's denial of defendants' motions did not implicitly excuse the government's obligations under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), or the Jencks Act, 18 U.S.C. § 3500.

The government filed four pre-trial motions: to change the place of trial, which the Court denied, to sequester the jury, which the Court retains under advisement, to quash the subpoenas, which is discussed in note 5, and for a special listing, which the Court granted.

established or use any guidelines in making these critical determinations. The government readily concedes that no such guidelines exist and counters that the Fifth Amendment and the Federal Rules of Criminal Procedure obviate the need for any. Since the real dispute is not over the facts concerning the existing standards which govern the initiation of federal felony prosecutions, but rather the appropriate legal conclusions to be drawn therefrom, an evidentiary hearing on this basis would serve no useful purpose and therefore will be denied.[5]

Defendant then moves to dismiss the indictment on the grounds that the prosecutor's unfettered discretion in deciding how the government should proceed against an accused violates his equal protection guarantees under the Fifth Amendment,[6] which also provides that

> [n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger . . .

An "infamous" crime is one in which the punishment includes confinement at hard labor, *United States v. Moreland*, 258 U.S. 433, 42 S.Ct. 368, 66 L.Ed. 700 (1922), incarceration in a penitentiary, *Mackin v. United States*, 117 U.S. 348, 6 S.Ct. 777, 29 L.Ed. 909 (1886), or imprisonment for more than one year, *Barkman v. Sanford*, 162 F.2d 592 (5th Cir.), *cert. denied*, 332 U.S. 816, 68 S.Ct. 155, 92 L.Ed. 393 (1947). Codified in Rule 7(a) of the Federal Rules of Criminal Proce-

dure, the constitutionally required procedure is that

> [a]n offense which may be punished by death shall be prosecuted by indictment. *An offense which may be punished by imprisonment for a term exceeding one year* or at hard labor *shall be prosecuted by indictment,* or if indictment is waived, it may be prosecuted by information. Any other offense may be prosecuted by indictment or information.

Clearly, in the federal criminal justice system the sole mechanism by which to institute charges against a prospective felony defendant is through the grand jury process,[7] *Branzburg v. Hayes*, 408 U.S. 665, 687, 92 S.Ct. 2646, 2659, 33 L.Ed.2d 626 (1972), *Costello v. United States*, 350 U.S. 359, 362, 76 S.Ct. 406, 408, 100 L.Ed. 397 (1956). The language of both the Amendment and the rule is mandatory. A federal accused must be indicted by the grand jury, and the prosecutor cannot circumvent this requirement.

In a limited number of situations, however, instituting a criminal prosecution by indictment is impracticable. Where a federal agent makes a warrantless arrest or there is a risk that a defendant will abscond or behave violently before a prosecutor can present the case to a grand jury, a complaint and warrant may be filed. Fed.R. Crim.P. 5(a). The government must still present the case to a grand jury for indictment as soon as possible after issuance of the complaint and warrant. *See* Affidavit of Peter F. Vaira, United States Attorney for the Eastern District of Pennsylvania, ¶¶ 2, 3. Thus, in the federal system all prospective felony defendants belong to the

---

5. Defendant Shober subpoenaed the Attorney General of the United States, a previous United States Attorney for the Eastern District of Pennsylvania and four former Assistant United States Attorneys, whose testimony, defendant contends, "is crucial to the issue of whether in fact guidelines exist". Moving to quash, the government conceded that no such guidelines exist at the level of the Department of Justice or the United States Attorney's Office in the Eastern District. Therefore, the testimony of the subpoenaed witnesses is unnecessary on this issue.

Our conclusion that defendant has not demonstrated even a colorable basis for his selective prosecution claim also makes their testimony on this score superfluous. Accordingly, the government's motion to quash the subpoenas will be granted.

6. Equal protection of the laws is implicit in the Fifth Amendment guarantee of due process of law. *Bolling v. Sharpe*, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

7. Defendants have all been charged with felonies. We express no opinion concerning defendants who are charged with misdemeanors.

same class. They are prosecuted by indictment and are entitled to a grand jury determination that there is probable cause to believe that a crime has been committed and that the accused has probably committed it. The prosecutor has no choices with respect to the manner in which a felony will be prosecuted.

The federal system is thus vastly different from the California state criminal justice system, which the California Supreme Court analyzed in *Hawkins v. Superior Court of San Francisco*, 22 Cal.3d 584, 150 Cal.Rptr. 435, 586 P.2d 916 (1978), the sole precedent for Shober's argument. *Hawkins* held that an accused is denied the equal protection of the laws guaranteed by the California state constitution when he is prosecuted by indictment and thereby deprived of a preliminary hearing and its concomitant rights. The California constitution provides that "[f]elonies shall be prosecuted as provided by law, *either* by indictment *or*, after examination and commitment by a magistrate by information". Art. I, § 14. Thus, the prosecutor *does* have discretion whether to prosecute felonies by indictment *or* information and to have probable cause determined by the grand jury *or* a magistrate. By design the California system creates two different classes of felony defendants[8]—those indicted by a grand jury and those charged by information after a preliminary examination before a magistrate—and permits the prosecutor to choose into which class any particular individual will fall. Unlike the federal prosecutor, who must submit *all* cases for grand jury scrutiny in order to bring felony defendants to trial, the California prosecutor may use the preliminary examination to determine whether the evidence justifies charging the suspect with an offense. Under the dichotomous California system the court justifiably found that a felony defendant charged by information after a preliminary examination received certain "fundamental" rights and benefits that a defendant charged by indictment was denied, and that the California prosecutor had com-

pletely unbridled discretion to make a discriminatory classification as to how a particular defendant was charged. *Id.* at 593, 150 Cal.Rptr. 435, 586 P.2d 916.

Defendant Shober seeks to graft the reasoning of the *Hawkins* majority onto the reality of the federal criminal justice system. The different function of the preliminary examination in the federal system makes this *non sequitur* obvious. Unlike California, where it plays a significant role in the charging process itself, in the federal system the preliminary examination is a complement to, not a substitute for, the grand jury process. The purpose of the preliminary examination is not to give discovery before trial, *United States v. Wilkins*, 422 F.Supp. 1371, 1374 (E.D.Pa.), aff'd, 547 F.2d 1164 (3d Cir. 1976), but rather to "justify holding the defendant in custody or on bail during the period of time it takes to bind the defendant over to the district court for trial", *Notes of Advisory Committee on Rules Concerning the 1972 Amendment to Fed.R.Crim.P. 5*, by providing a reasonably prompt determination of probable cause in cases where a person has been arrested by warrant issued upon a complaint. *Gerstein v. Pugh*, 420 U.S. 103, 120–23, 95 S.Ct. 854, 866–67, 43 L.Ed.2d 54 (1975), *United States v. Conway*, 415 F.2d 158, 161 n. 4 (3d Cir. 1969). *See also* Fed.R.Crim.P. 5, 5.1 and 18 U.S.C. § 3060. Waiting for a grand jury to indict

> might require arrested individuals to spend long periods of time in jail on groundless charges . . . Though the preliminary hearing provided for in Rule 5(c) may be a practical tool for discovery by the accused, *the only legal justification for its existence is to protect innocent accuseds from languishing in jail on totally baseless accusations.* Rule 5(c) requires the government to justify its incarceration by proving in a preliminary hearing before a judicial officer that there is probable cause to believe the accused committed the charged offense.

---

**8.** The *Hawkins* majority expressly recognized that there were two methods of initiating a

felony prosecution in California. *Id.* at 587 n. 1, 150 Cal.Rptr. 435, 586 P.2d 916.

. . . *If the grand jury returns a true bill prior to the time a preliminary hearing is held the whole purpose and justification of the preliminary hearing has been satisfied.*

*Spinelli v. United States,* 382 F.2d 871, 887 (8th Cir. 1967), *rev'd. on other grounds,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969) (emphasis added and citations omitted). *See also United States v. Carignan,* 342 U.S. 36, 72 S.Ct. 97, 96 L.Ed. 48 (1951). The incidental benefits which may derive from a preliminary examination may not be elevated and transformed into fundamental constitutional rights which must be protected in every criminal prosecution. *United States v. Farries,* 459 F.2d 1057, 1062 (3d Cir. 1972).

■ Defendant also contends that the prosecutor's ability to truncate an arrested but unindicted defendant's right to a preliminary examination by obtaining a grand jury indictment within ten days of the initial appearance also violates an accused's equal protection and due process protections.[9] Defendant points to the absence of any neutral, identifiable criteria to limit the prosecutor's discretion. Again, the Fifth Amendment and Federal Rules of Criminal Procedure circumscribe the prosecutor's actions. He must present the case to the grand jury, and only in extraordinary circumstances, such as where no grand jury is sitting or evidence is not available, does the ten-day period expire and the defendant is afforded a preliminary examination prior to the action of the grand jury. The fact that under occasional circumstances undictated by the prosecutor some defendants receive a preliminary examination does not violate the equal protection guarantees of defendants whom a grand jury indicts. Defendant's motion will be denied.

■ Alternatively, defendant demands a post-indictment preliminary examination to redress the supposed imbalance created by grand jury indictment. Defendant fails to explain what this court, or a magistrate, will determine at this hearing. Certainly probable cause will not be rele-

vant, for the grand jury determination thereof is conclusive, *Rodriguez v. Ritchey,* 556 F.2d 1185, 1191 (5th Cir. 1977), *cert. denied,* 434 U.S. 1047, 98 S.Ct. 894, 54 L.Ed.2d 799 (1978), and discovery *per se* is beyond its purview. *United States v. Conway, supra.* Equally unclear is the appropriate basis upon which to grant this hearing. Defendant has no constitutional right to a preliminary examination. *United States ex rel. Kassin v. Mulligan,* 295 U.S. 396, 400, 55 S.Ct. 781, 782, 79 L.Ed. 1501 (1943), *United States v. Walker,* 491 F.2d 236, 238 (9th Cir.), *cert. denied,* 416 U.S. 990, 94 S.Ct. 2399, 40 L.Ed.2d 768 (1974), *Harris v. Estelle,* 487 F.2d 1293, 1296 (5th Cir. 1974), *United States v. Farries, supra,* at 1062, *United States v. Coley,* 441 F.2d 1299, 1301 (5th Cir.), *cert. denied,* 404 U.S. 867, 92 S.Ct. 85, 30 L.Ed.2d 111 (1971), *Sciortino v. Zampana,* 385 F.2d 132, 134 (2d Cir.), *cert. denied,* 390 U.S. 906, 88 S.Ct. 820, 19 L.Ed.2d 872 (1968), *United States v. Chase,* 372 F.2d 453, 467 (4th Cir.), *cert. denied,* 387 U.S. 907, 87 S.Ct. 1688, 18 L.Ed.2d 626 (1967), *Braxton v. Peyton,* 365 F.2d 563, 565 (4th Cir.), *cert. denied,* 385 U.S. 939, 87 S.Ct. 306, 17 L.Ed.2d 218 (1966), *United States v. Wilkins, supra,* at 1375, *United States v. Barone,* 311 F.Supp. 496, 498 (W.D.Pa.1970). Nor does denial of a preliminary examination violate due process, *United States v. Mulligan,* 520 F.2d 1327, 1329 (6th Cir. 1975), *Rivera v. Government of the Virgin Islands,* 375 F.2d 988, 989 (3d Cir. 1967), *United States v. Luxenberg,* 374 F.2d 241, 247 (6th Cir. 1967), *United States v. Smith,* 343 F.2d 847, 850 (6th Cir.), *cert. denied,* 382 U.S. 824, 86 S.Ct. 55, 15 L.Ed.2d 69 (1965), *Lunsford v. Howard,* 316 F.Supp. 1125, 1126 (E.D.Ky.1970), or *ipso facto* legally prejudice defendant, *United States v. English,* 501 F.2d 1254, 1258 (7th Cir. 1974), *United States v. Milano,* 443 F.2d 1022 (10th Cir.), *cert. denied,* 404 U.S. 943, 92 S.Ct. 2294, 30 L.Ed.2d 258 (1971), *United States v. Hinkle,* 307 F.Supp. 117 (D.D.C.1969). *Cf. Baker v. McCollan,* 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979) (adversarial hearing not required to

**9.** We assume, *arguendo,* that defendant Shober has standing to raise this issue.

determine probable cause). Scheduling of a post-indictment preliminary examination will serve no meaningful purpose, and the motion therefor will be denied.

The second of defendant Shober's three pre-trial motions requesting an evidentiary hearing is a motion to dismiss the indictment on the ground, inter alia, that the government selectively and discriminatorily prosecuted the defendant. To substantiate this claim, defendant seeks an evidentiary hearing. Defendant's claim of selective prosecution rests on three distinct arguments. First, the government singled defendant out for prosecution from among hundreds of persons who engage in the traditional practice of tendering financial contributions to political candidates who support positions favorable to the donor's institution. Defendant, the donor, merely intended to create a favorable attitude in the mind of the donee (Flood) towards the needs of defendant's institution. Defendant simply exercised his First Amendment right to petition his government for redress of grievances. Defendant's second claim is that he was the victim of extortion rather than a briber and therefore should have been treated as a victim. Alternatively, even as an alleged briber, he should not have been prosecuted since the government's practice is to indict only recipients of bribes, not the bribe giver.

 Defendant's first claim, that the money given to Congressman Flood was part of a traditional business practice of tendering political contributions to promote a favorable business climate for federal funds which Hahnemann needed, is essentially a challenge to the truth of the allegation that defendant "corruptly" gave the Congressman money to influence his official action on Hahnemann's application for federal funding. Whether defendant paid this money to the Congressman with "corrupt" intent or merely as a "traditional" political gift is a question for the jury to decide at trial. Similarly, defendant's contention that he is not a briber but a victim of extortion also reaches the merits of the charge made in the indictment. This ques-

tion will also be one for the jury to decide. In essence, both require a determination of defendant's intent, which is a question of fact. Where a pre-trial motion raises questions of fact which are "interwined with issues involving the merits, a determination of that matter must be deferred until trial". *United States v. Greater Syracuse Board of Realtors, Inc.*, 449 F.Supp. 887, 899 (N.D.N.Y.1978).

 Defendant's third argument, that his prosecution as a bribe giver is unfairly selective because the government always nabs the bribe recipient, comes closer to a true selective prosecution claim. Defendant is entitled to an evidentiary hearing if he can make an initial showing that there is a "colorable basis" for his selective prosecution claim. *United States v. Torquato*, 602 F.2d 564 at 570 (3d Cir. 1979), *United States v. Cammisano*, 546 F.2d 238, 241 (8th Cir. 1976), *United States v. Berrios*, 501 F.2d 1207, 1211 (2d Cir. 1974), *United States v. Berrigan*, 482 F.2d 171, 177 (3d Cir. 1973). He must adduce some credible evidence "tending to show the existence of the essential elements of [this] defense" and that the testimony would indeed be probative thereof. *United States v. Berrios*, 501 F.2d at 1211–12. *See also United States v. Torquato*, 602 F.2d at 570. That is, defendant must show the existence of facts sufficient "to raise a reasonable doubt about the prosecutor's purpose", *United States v. Falk*, 479 F.2d 616, 620–21 (9th Cir. 1973), and "to take the question past the frivolous stage". *United States v. Oaks*, 508 F.2d 1403, 1404 (9th Cir. 1974), *cert. denied*, 426 U.S. 952, 96 S.Ct. 3177, 49 L.Ed.2d 1191 (1976).

 The two elements of selective prosecution, which defendant has the burden of proving, *United States v. Malinowski*, 472 F.2d 850, 860 (3d Cir. 1973), include an allegation that the selection was deliberately based upon "an unjustifiable standard such as race, religion, or other arbitrary classification", *Bordenkircher v. Hayes*, 434 U.S. 357, 364, 98 S.Ct. 663, 669, 54 L.Ed.2d 604 (1978), *Oyler v. Boles*, 368 U.S. 448, 456, 82 S.Ct. 501, 505, 7 L.Ed.2d 446, or the exercise of a fundamental right, *United*

*States v. Smith,* 523 F.2d 771, 782 (5th Cir. 1975), *cert. denied,* 429 U.S. 817, 97 S.Ct. 59, 50 L.Ed.2d 76 (1976), *United States v. Swanson,* 509 F.2d 1205, 1208 (8th Cir. 1975), *United States v. Steele,* 461 F.2d 1148, 1151 (9th Cir. 1972) *and* an allegation that others similarly situated have not been prosecuted for the same type of conduct which forms the basis of defendant's prosecution. *United States v. Kelly,* 556 F.2d 257, 264 (5th Cir. 1977), *cert. denied,* 434 U.S. 1017, 98 S.Ct. 737, 54 L.Ed.2d 763 (1978), *United States v. Bourque,* 541 F.2d 290, 292–93 (1st Cir. 1976), *United States v. Scherer,* 523 F.2d 371, 377 (7th Cir. 1975), *cert. denied,* 424 U.S. 911, 96 S.Ct. 1108, 47 L.Ed.2d 315 (1976), *United States v. Swanson,* 509 F.2d at 1208–09, *United States v. Steele,* 461 F.2d at 1150–52, *United States v. Berrios,* 501 F.2d at 1211. *See, for example, United States v. Oaks, supra* (defendant's public protest against federal tax policy), *United States v. Falk, supra* (defendant's participation in a draft counseling organization opposing the war in Vietnam), *United States v. Steele, supra* (defendant's public protest against census laws), *United States v. Crowthers,* 456 F.2d 1074 (4th Cir. 1972) (defendant's participation in a "mass for peace"), *United States v. Cammisano,* 413 F.Supp. 886 (W.D.Mo.), *rev'd on other grounds,* 546 F.2d 238 (8th Cir. 1976) (defendant's Italian ancestry).

█ To establish the first element of this defense, defendant points to his gift to the Congressman as an exercise of his First Amendment right to petition the government for redress of grievances and relies on *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 139, 81 S.Ct. 523, 530, 5 L.Ed.2d 464 (1961), in which the court declared that

> [t]he right of the people to inform their representatives in government of their desires with respect to the passage or enforcement of *laws* cannot properly be made to depend upon their intent in doing so. It is neither unusual nor illegal for people to seek action on *laws* in the hope that they may bring about an advantage to themselves and a disadvan-

tage to their competitors. (emphasis added)

Applying this reasoning to the instant situation commands a wholly different result. Shober does not suggest that the gift was intended to spur the Congressman's interest in a particular piece of legislation. Instead he candidly admits that the gift was to promote a favorable "business" or political climate at a time when a *private* request for federal funding was pending before the Congressman. Whether the gift was a bribe will be for the jury to determine, but an expression of private interest *in the passage or enforcement of public laws* it was not. It is, therefore, extremely doubtful whether defendant has met even the threshold requirement, an allegation of prosecutorial selectivity based on the exercise of a fundamental right.

In support of the second requirement, defendant cites one indictment, *United States v. Winner,* No. 79–119 (E.D.Pa. filed May 8, 1979), an extortion case brought as part of a continuing investigation in which the government prosecuted the bribe recipient and not the bribe giver. In rebuttal the government offers two recent prosecutions instituted by the United States Attorney's office in this district and indicting both the bribe giver *and* recipient. Six individuals and two corporations were included in an indictment in *United States v. Barszowski,* No. 78–281 (E.D.Pa. filed September 21, 1978), which charged that officers and employees of corporations doing contracting and sub-contracting work for the Pennsylvania Department of Transportation (Penndot) were systematically paying bribes to a key Penndot official in the Philadelphia district office. Both the Penndot official who received the bribes and the persons who gave the bribes were indicted. In *United States v. Miller,* No. 78–244 (E.D.Pa. filed July 27, 1978) and *United States v. Fontaine,* No. 78–54 (E.D.Pa. filed March 2, 1978) defendants were operators of gambling activities in Chester, Pennsylvania. They were indicted for racketeering in connection with their systematic giving of bribes to the mayor, who was charged in a separate indictment, *United States v. Na-*

*crelli,* No. 78–165 (E.D.Pa. filed May 18, 1978). Noting that the federal bribery statute under which defendant has been prosecuted prohibits *both* the *giving* and *receiving* of bribes, 18 U.S.C. § 201(b) through (h), *United States v. Anderson,* 509 F.2d 312 (D.C. Cir. 1974), *cert. denied,* 420 U.S. 991, 95 S.Ct. 1427, 43 L.Ed.2d 672 (1975), *United States v. Jacobs,* 431 F.2d 754 (2d Cir. 1970), *cert. denied sub nom. Spieler v. United States,* 402 U.S. 950, 91 S.Ct. 1634, 29 L.Ed.2d 120 (1971), *United States v. Miller,* 340 F.2d 421 (4th Cir. 1965), *United States v. Labowitz,* 251 F.2d 393 (3d Cir. 1958), the government has represented that there is no government policy either at the level of the Department of Justice or the United States Attorney's office in this district that prescribes or directs that only bribe recipients should be prosecuted under the bribery statute.

█ Besides, the frequency with which the government indicts bribe givers as opposed to bribe recipients is not particularly relevant, *United States v. Berrigan,* 482 F.2d at 179. *See also United States v. Cammisano, supra.* Neither is it particularly relevant that the government decided to prosecute only the bribe giver in this instance, *United States v. Berrigan,* 482 F.2d at 181, because mere deviation from prosecutorial policy would not by itself support a selective prosecution claim. *United States v. Spillman,* 413 F.2d 527, 530 (9th Cir.), *cert. denied,* 396 U.S. 930, 90 S.Ct. 265, 24 L.Ed.2d 228 (1969). To require the United States Attorney to prosecute all crimes identically would effectively eliminate his ability to evaluate independently the myriad complex factors which affect the prosecutorial decision. See *Newman v. United States,* 382 F.2d 479 (D.C. Cir. 1967). For example, in *United States v. Berrigan, supra,* the defendant, charged with illegally sending letters into and out of a federal penitentiary, posited that the commonplaceness of the offense and the government's failure to prosecute the courier of these letters made the defendant's prosecution discriminatory. The Third Circuit rejected both arguments. Likewise, Shober contends that the commonplaceness of his of-

fense, tendering a gift to promote a favorable "business" or political climate, and the government's failure to prosecute the bribe recipient constitutes selective prosecution. Whatever vitality Shober's contentions possess *Berrigan* eviscerates.

█ Of course, a prosecutor's discretion in law enforcement is not unlimited, *Bordenkircher v. Hayes,* 434 U.S. at 364–65, 98 S.Ct. at 668–669, *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886), but it is exceedingly broad, *Arnold v. McCarthy,* 556 F.2d 1377, 1388 (9th Cir. 1978), *United States v. Bell,* 506 F.2d 207, 222 (D.C. Cir. 1974), *United States v. Brown,* 508 F.2d 427, 434 (8th Cir. 1974), *Spillman v. United States,* 413 F.2d at 530, *Newman v. United States,* 382 F.2d at 481–82, and "the presumption is always that a prosecution . . . is undertaken in good faith and in nondiscriminatory fashion for the purpose of fulfilling a duty to bring violators to justice". *United States v. Falk,* 479 F.2d at 620. *See also United States v. Torquato,* 602 F.2d at 570. Accordingly, some conscious selectivity is not *ipso facto* a federal constitutional violation. *Bordenkircher v. Hayes,* 434 U.S. at 364–65, 98 S.Ct. at 668–669, *Oyler v. Boles,* 368 U.S. at 456, 98 S.Ct. at 505, *Newman v. United States,* 382 F.2d at 480.

Defendant has failed to make even a prima facie showing of the existence of the second element. With no colorable basis upon which to schedule an evidentiary hearing judicial review of the prosecutorial decision is unwarranted. Defendant's motion for an evidentiary hearing and his motion to dismiss the indictment on this basis will be denied.

Defendant Shober's third motion, to dismiss the indictment on grounds of improper and inadequate grand jury instructions, also seeks an evidentiary hearing to support these claims. Defendant contends that neither the judge who impanelled the grand jury nor the assistant United States attorney who presented the government's case provided any guidelines, criteria or assistance with respect to the credibility of wit-

nesses generally and the chief government witness, Stephen B. Elko, specifically. In addition, neither the judge nor government counsel advised the grand jury that the chief government witness had a prior criminal conviction for perjury and would testify under a grant of immunity. Nor did the government bring to the grand jury's attention a conceivable discrepancy between Elko's testimony before them and the House Ethics Committee. Finally, the grand jury received no guidance with respect to the applicable law involved and the particular elements of the alleged offenses. Without these enumerated caveats, defendant argues, the grand jury could not have been able to weigh testimony carefully, to seek corroboration through testimony of other witnesses, to evaluate evidence and testimony independently and to render an unbiased conclusion. Defendant apparently construes these omissions as violations of his constitutional right to be indicted by a legally constituted and unbiased grand jury. See *United States v. Serubo,* 604 F.2d 807, 816 (3d Cir. 1979), and *Costello v. United States,* 350 U.S. at 363, 76 S.Ct. at 408.

Implicit in defendant's argument is the notion that the grand jury must receive copious instructions explaining credibility of witnesses and applicable law in much the same manner as a trial judge charges a petit jury. This position misperceives the wholly different character and purpose of the two bodies. The basic function of a federal grand jury is to provide "a fair method for instituting criminal proceedings against persons believed to have committed crimes", *Costello v. United States,* 350 U.S. at 362, 76 S.Ct. at 408, and historically, to protect the public from an overzealous prosecutor by interposing a lay buffer between them. *United States v. Calandra,* 414 U.S. 338, 343, 94 S.Ct. 613, 617, 38 L.Ed.2d 561 (1974), *Branzburg v. Hayes,* 408 U.S. at 687 n. 23, 92 S.Ct. 2646, 2659, 33 L.Ed.2d 626 (1972), *Wood v. Georgia,* 370 U.S. 375, 390, 82 S.Ct. 1364, 1373, 8 L.Ed.2d 569 (1962), *Ealy v. Littlejohn,* 569 F.2d 219, 226 (5th Cir. 1978), *Gaither v. United States,* 413 F.2d 1061, 1066 (D.C. Cir. 1969), *United States v. Samango,* 450 F.Supp. 1097, 1102 (D.Haw.1978), *United States v. Bailey,* 332 F.Supp. 1351, 1354 (N.D.Ill. 1971). Importantly, the grand jury determines not the guilt or innocence of the accused, but rather whether there is probable cause to believe that the accused has committed a crime. *Bracey v. United States,* 435 U.S. 1301, 1302, 98 S.Ct. 1171, 1172, 55 L.Ed.2d 489 (1977), *United States v. Calandra,* 414 U.S. at 343–44, 94 S.Ct. at 617–18, *In re Grand Jury Subpoenas,* 573 F.2d 936, 939 (6th Cir. 1978), *United States v. Zarattini,* 552 F.2d 753, 756 (7th Cir.), *cert. denied,* 431 U.S. 942, 97 S.Ct. 2661, 53 L.Ed.2d 262 (1977), *United States v. Levinson,* 405 F.2d 971, 980 (6th Cir. 1968), *cert. denied sub nom. Strang v. United States,* 395 U.S. 906, 89 S.Ct. 1746, 23 L.Ed.2d 219 (1969), *In re Weir,* 377 F.Supp. 919, 925 (S.D.Cal.), *aff'd,* 495 F.2d 879 (9th Cir.), *cert. denied sub nom. Weir v. United States,* 419 U.S. 1038, 95 S.Ct. 525, 42 L.Ed.2d 315 (1974), *United States v. Wortman,* 26 F.R.D. 183, 204 (E.D.Ill.1960). Constitutional rights and derivative prophylactic rules designed to guarantee a fair and impartial verdict are not necessary in the grand jury context. Precautionary and specific jury instructions as well as unfailing allegiance to rights and rules are more appropriately reserved for trial. *Bracey v. United States,* 435 U.S. at 1302–03, 98 S.Ct. 1171, 1172, *Costello v. United States,* 350 U.S. at 364, 76 S.Ct. at 409. For this reason the Supreme Court has not imposed evidentiary rules or technical requirements to circumscribe the grand jury process either as a constitutional mandate or through its supervisory power over inferior federal courts. *United States v. Calandra,* 414 U.S. at 343, 94 S.Ct. at 617, *Costello v. United States,* 350 U.S. at 363–64, 76 S.Ct. at 408–09. An indictment may be premised in part on hearsay or other incompetent evidence. *United States v. Calandra,* 414 U.S. at 345, 94 S.Ct. at 618, *Costello v. United States,* 350 U.S. at 363–64, 76 S.Ct. at 408–09, *Holt v. United States,* 218 U.S. 245, 247–48, 31 S.Ct. 2, 4, 54 L.Ed.2d 1021 (1910). In fact, an indictment may even be supported by evidence obtained in violation of a defend-

ant's Fifth Amendment privilege against self-incrimination, *Lawn v. United States*, 355 U.S. 339, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958), or of the Fourth Amendment, *United States v. Calandra*, 414 U.S. at 354–55, 94 S.Ct. at 622–23. *Cf. Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972) (grand jury may not force a witness to answer questions which incriminate him) and *Boyd v. United States*, 116 U.S. 616, 633–35, 6 S.Ct. 524, 533–34, 29 L.Ed. 746 (1886) (grand jury may not force a witness to produce documents which incriminate him).

It follows that the government has no obligation to present to the grand jury evidence tending to undermine the credibility of government witnesses, *United States v. Y. Hata & Co.*, 535 F.2d 508, 512 (9th Cir.), *cert. denied*, 429 U.S. 828, 97 S.Ct. 87, 50 L.Ed.2d 92 (1976), *Jack v. United States*, 409 F.2d 522, 524 (9th Cir. 1969), or to bring to the attention of the grand jury every conceivable discrepancy in the government's case, especially where the prosecutor believes in good faith that the inconsistency is not material, *United States v. Kennedy*, 564 F.2d 1329, 1338 (9th Cir. 1977), *United States v. Basurto*, 497 F.2d 781, 784–86 (9th Cir. 1974), in the context of the entire prosecution, *United States v. Berrigan*, 482 F.2d at 179. Nor must the government detail the law applicable to every potential offense against the accused, for the grand jury need not be convinced *beyond a reasonable doubt* that the defendant in fact committed the offense. *United States v. Slepicoff*, 524 F.2d 1244 (5th Cir. 1975). More accurately, "it is sufficient if the evidence before the Grand Jury provided reasonable grounds for belief that all of the essential elements of the crime did in fact occur". *United States v. Fineman*, 434 F.Supp. 189, 196 (E.D.Pa.1977).

Similarly, a judge who impanels a grand jury has no corresponding responsibility to delve into legal esoterica with the hope of inculcating into every grand juror a capsulized law school education, for grand juries do not deliver indictments in a microcosm devoid of legal understanding. To the contrary, grand jurors, who draw upon their collective common sense, experience and adscititious knowledge, also receive a wealth of information describing the grand jury function in the federal criminal justice system. The Clerk's office provides each grand juror with a "Handbook for Federal Grand Jurors", which traces the origin and history of the grand jury from the time of Magna Charta, describes the grand jury's tasks of investigation and probable cause determination, outlines the procedure used therefor and includes a glossary which explains numerous legal concepts.[10] The judge who impanelled the particular grand jury which indicted defendant also elaborated upon the history of the grand jury concept, the meaning of "indictment", "presentment", "probable cause" and "hearsay" and the duties of the grand jury and the United States Attorney. He specifically instructed them, in part, that

> If from the competent, credible evidence submitted to you, you find that probable cause exists, you should return a true bill, which is to indict.

> But, if you find that there is no probable cause, then you should ignore the bill and refuse to return a true bill.

> Please bear in mind, you are an independent body accountable to the Court. You are not a prosecutor's tool. You are there to serve, as I said, the important role of the buffer between the prosecutor and the accused.

> On the other hand, bear in mind you are not a trial jury. It is not your function to determine the guilt or innocence of the accused. You are only to determine whether there is probable cause to believe that an offense was committed, and probable cause to believe that the accused committed it . . . . .

---

**10.** The handbook defines "accused", "charge to the grand jury", "deliberations", "district", "evidence", "federal", "immunity", "indictment", "information", "no bill", "probable cause", "petit jury", "quorum for grand jury to conduct business", and "United States Attorney".

*Bear in mind that when witnesses are presented to you you get only one version; you get the Government presentation of the evidence. You do not have the benefit of cross-examination of the accused's attorney to test the credibility of the testimony presented.*

But, at the time of trial there will then be a full opportunity for cross-examination of all the witnesses . . .

Probable cause exists only where there is competent evidence, direct or circumstantial, which leads you, as reasonable persons, to believe that the accused probably did commit the offense charged . .

You should listen carefully to the advice of the United States Attorney and his assistants, but *you have no obligation whatsoever to adopt any recommendation that he may have to give you as to what your decision in a particular case should be.* (emphasis added)

*See* In Re Grand Jury, Impaneling of the Grand Jury, October 27, 1977. In addition, the assistant United States attorney in charge of the grand jury investigation which culminated in defendant's indictment, immediately prior to Stephen B. Elko's testimony before the grand jury, June 1, 1978, advised them off the record [11] of

the identity of the next witness and the relationship of the witness to the matters under investigation. [He] informed the

grand jurors that Mr. Elko was the former administrative assistant to Congressman Daniel J. Flood . . . that Mr. Elko had been convicted of bribery, perjury and obstruction of justice charges in a California federal court and that those charges grew out of a scheme unrelated to the Hahnemann Hospital manner. [He] informed the grand jurors that Mr. Elko was currently serving a federal prison sentence resulting from his California conviction, that he had been granted use immunity by court order so that any information he provided to the Government and the grand jury would not be used against him and that he was now cooperating with the Government in several investigations, including the Hahnemann Hospital matter.

Government counsel did not address the alleged inconsistency in Elko's testimony because he had not seen a transcript of Elko's House Ethics Committee testimony prior to presentation of the indictment and was not aware of any material inconsistency between Elko's grand jury and House Ethics Committee testimony. Finally, government counsel read to the grand jurors the language of 18 U.S.C. § 1341 and § 2, and after reviewing the mail fraud and aiding and abetting counts of the indictment, asked the grand jury, "At this time, are there any questions about the mail fraud count or the scheme that is alleged?" Then he read the bribery statute, 18 U.S.C.

---

**11.** To determine *why* the prosecutor made these remarks and *if* he provided other indicia of Elko's credibility "off the record", the Court held a limited evidentiary hearing at which the prosecutor testified that he made no other "off the record" remarks to the grand jury concerning Elko's credibility, that he did not direct the court reporter to go "off the record" and that the court reporter's failure to record these remarks happened inadvertently "through lack of communication".

Defendant, demanding dismissal of the indictment, alleges prejudice from the very ability of the prosecutor to go "off the record". However, defendant need not show actual prejudice to invoke the Court's supervisory power, for "federal courts have an institutional interest, independent of their concern for the rights of the particular defendant in preserving and protecting the appearance and the reality of

fair practice before the grand jury". But "in the absence of any showing 'that the conduct [of the prosecutor] added substantive matters or was anything other than an isolated incident unmotivated by sinister ends' " exercise of that power is unwarranted. *United States v. Serubo,* 604 F.2d at 816–817, quoting *United States v. Birdman,* 602 F.2d 547 at 559 (3d Cir. 1979). From the testimony presented at the evidentiary hearing we find that the prosecutor's off-the-record remarks were an isolated incident unmotivated by sinister ends. Future problems of this type will be remedied by the recent amendment to the Federal Rules of Criminal Procedure, which now require recording of all grand jury dialogue. *See* Fed.R.Crim.P. 6(e)(1) (effective August 1, 1979). Accordingly, defendant's motion to dismiss the indictment on this basis will be denied.

§ 201, and the two counts which alleged defendants violated this provision in the indictment. Again counsel asked the grand jury if anyone had any questions. On the same day, when an attorney from the Philadelphia Strike Force questioned Elko in front of the grand jury, the following exchange occurred:

Q. What is your present occupation?

A. I'm a prisoner.

Q. You have been convicted; is that correct?

A. Yes.

Q. What were you convicted of?

A. Conspiracy, obstruction of justice, bribery, perjury, and interstate trafficking to commit bribery.

Q. And, you've been sentenced to prison; is that correct?

A. Three years at the Federal Correctional Institution at Lompoc, California.

Q. When were you convicted?

A. October 20th, 1977.

Q. Subsequent to that time, were you granted use immunity?

A. Yes, I was.

Q. Where were you granted use immunity?

A. In November in Philadelphia and November, 1977, in Washington, D.C.

Q. Now, you understand that in connection with that grant of use immunity that the grant of use immunity in no way immunizes you from any prosecution from perjury if you were to lie in front of this Grand Jury; is that correct?

A. Yes, I do.

Later Elko admitted lying to the Los Angeles grand jury.

Q. When you testified before the Grand Jury in Los Angeles, California, in April of 1976, were you asked whether any bribe payments regarding the West Coast Trade School situation had been made to you or to Congressman Flood?

A. Yes.

Q. Did you lie to the Grand Jury with respect to that particular fact?

A. Yes, I did.

Q. Isn't it true that you [and others] agreed before hand that you would appear before that Grand Jury in Los Angeles, California, and tell an untruthful story to that Grand Jury?

A. Yes, I did.

* * * * * *

Q. Do you believe that both Congressman Flood and [one other person] in arranging these payments and compensation for you knew one of the purposes of the payments was to keep you from telling the truth to the Grand Jury in Los Angeles, California, and to keep you from disclosing to the Grand Jury in Los Angeles, California, or disclosing in any other criminal investigation related to bribe payments to yourself and Congressman Flood what the actual truth is?

A. Yes.

The Philadelphia Strike Force attorney also asked the grand jurors if they had any questions. This time several jurors did ask Elko questions. To require more that these instructions and precautions would contort the grand jury procedure into a preliminary trial on the merits. *See United States v. Dionisio,* 410 U.S. 1, 17, 93 S.Ct. 764, 773, 35 L.Ed.2d 67 (1973), *Costello v. United States,* 350 U.S. at 363, 76 S.Ct. at 408.

▇▇ To conclude, a presumption of regularity attaches to grand jury proceedings, *Hamling v. United States,* 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974), which should not be disturbed absent a showing of impropriety, *United States v. Tedesco,* 441 F.Supp. 1336 (E.D.Pa.1977). Defendant's broad allegations of inadequate instructions are insufficient to defeat this strong presumption under these circumstances. This motion will also be denied.

▇▇ Defendant Shober's final request is for an order requiring the government to permit him to examine all grand jury notes of testimony, the voting record of the grand jury, a copy of the original indictment and all minutes from grand juries assembled throughout the nation to

hear matters relating to those brought to the attention of the Philadelphia grand jury which indicted defendant. Disclosure of grand jury materials is controlled by Fed.R. Crim.P. 6(e), which

> was not designed as an authorization for pretrial discovery. Its purpose, on the contrary, is to protect the secrecy of the Grand Jury proceedings by restricting disclosure to the exceptional case where a particularized need is shown.

*United States v. Weinstein,* 511 F.2d 622, 627 (2d Cir.), *cert. denied,* 422 U.S. 1042, 95 S.Ct. 2655, 45 L.Ed.2d 693 (1975). Defendant has the burden of showing that his "particularized need" or "compelling necessity" for grand jury notes of testimony outweighs the general policy of grand jury secrecy. *Pittsburgh Plate Glass Co. v. United States,* 360 U.S. 395, 400, 79 S.Ct.

1237, 1241, 3 L.Ed.2d 1323 (1959). *See also Smith v. United States,* 423 U.S. 1303, 96 S.Ct. 2, 46 L.Ed.2d 9 (1975), *Dennis v. United States,* 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966), and *United States v. Proctor & Gamble,* 356 U.S. 677, 78 S.Ct. 983, 2 L.Ed.2d 1077 (1958).[12] Defendant supports his particularized need by emphasizing not only that he never received a preliminary examination at which he could have determined the nature and strength of the evidence against him but also that grand jury testimony known to defendant suggests that there was insufficient evidence before the grand jury to support an indictment. Again defendant refers only to *his* construction of testimony given by Stephen B. Elko to the Philadelphia grand jury which indicted defendant and later to the

12. Although arising in the context of a civil litigant's right to obtain transcripts of a federal criminal grand jury proceeding, *Douglas Oil Co. v. Petrol Stops Northwest,* 441 U.S. 211, 99 S.Ct. 1667, 60 L.Ed.2d 156 (1979), reviewed the appropriate standard

> for determining when the traditional secrecy of the grand jury may be broken: Parties seeking grand jury transcripts under Rule 6(e) must show that the material they seek is needed to avoid a possible injustice in another judicial proceeding, that the need for disclosure is greater than the need for continued secrecy, and that their request is structured to cover only material so needed . . . (D)isclosure is appropriate only in those cases where the need for it outweighs the public interest in secrecy, and . . . the burden of demonstrating this balance rests upon the private party seeking disclosure. . . . (T)he court's duty in a case of this kind is to weigh carefully the competing interests in light of the relevant circumstances and the standard announced by this Court.

*Id.* at 1674. Defendant's request in the case at bar is not carefully tailored "to cover only material so needed". Instead defendant requests transcripts from *any* grand juries sitting *throughout* the nation. The request does not state a need "with particularity". *See also Pittsburgh Plate Glass v. United States,* 360 U.S. at 400, 79 S.Ct. at 1241, and *United States v. Proctor & Gamble,* 356 U.S. at 683, 78 S.Ct. at 986.

The *Douglas* Court also reiterated the "distinct interests served by safeguarding the confidentiality of grand jury proceedings". Specifically,

> if preindictment proceedings were made public many prospective witnesses would be hesitant to come forward voluntarily, knowing

> that those against whom they testify would be aware of that testimony. Moreover, witnesses who appeared before the grand jury would be less likely to testify fully and frankly, as they would be open to retribution as well as to inducements. There also would be the risk that those about to be indicted would flee, or would try to influence individual grand jurors to vote against indictment. Finally, by preserving the secrecy of the proceedings we assure that persons who are accused but found innocent by the grand jury will not be held up to public ridicule. (footnotes omitted)

*Id.* at 1673. Defendant minimizes the importance of the first factor with the observation that "[t]he argument that witnesses will come forward more freely deserves little weight since in all cases the witnesses are aware that their identity may be made known at a future trial". Defendant's Reply Memorandum at 4. Yet *Douglas* specifically cautioned that courts, "in considering the effect of disclosure on grand jury proceedings", should recognize

> not only the immediate effects upon a particular grand jury, but also the possible effect upon the functioning of future grand juries. Persons called upon to testify will consider the likelihood that their testimony may one day be disclosed to outside parties. Fear of future retribution or social stigma may act as powerful deterrents to those who would come forward and aid the grand jury in the performance of its duties.

*Id.* at 1674. Appropriate concern is voiced especially when the grand jury probe involves high ranking government officials and legislators.

House Ethics Committee. Before the grand jury Elko answered the following questions:

Q. What did you understand [Flood] to mean by "Make that $50,000"?

A. That [Flood] wanted $50,000 in cash kickbacks for the work we were doing.

Q. Did you ever relate that to Wharton Shober?

A. Yes, I did.

\* \* \* \* \* \*

Q. Is it fair to say then that the project monitor's position, as it ultimately became known, was important to you for the reason that it would facilitate the getting out of money, cash money, for kickback purposes to yourself and others?

A. Yes. That's precisely their function.

Q. Do you have any reason to believe that Wharton Shober understood that this was the importance of the project administrator's or monitor's job to you?

A. Oh, I made that very clear to Shober that he wasn't going to get any grant, federal grant monies for his institution if he didn't take the people that we wanted for the project monitor's, project administrator's, position.

Before the House Ethics Committee three months later the following exchange occurred:

Q. Shober was not aware, then, that you planned to use EDIC for kickbacks?

A. I don't know.

Q. You did not inform him?

A. I did not inform him or appraise him . . . I don't think [Shober] was ever knowledgeable [about kickbacks].

Defendant considers these remarks contradictory and perjurious. The government, on the other hand, reconciles them in the following way: Elko testified that Shober agreed to insert EDIC/CIDC as project monitor for the Tower Project as a precondition for obtaining the grant. The fact that Elko did not specifically tell Shober that he, Elko, intended to obtain kickback money

from the principals of EDIC/CIDC fails to establish that Elko was inconsistent or perjurious.[13] Defendant further claims that the grand jury indicted him solely on the basis of the above quoted testimony and seeks the grand jury notes to substantiate his surmise. "[W]hen an individual is faced with the possibility of unjust prosecution", argues defendant, "it is imperative that his counsel examine the grand jury transcripts to assure that no improprieties have occurred before the grand jury". Defendant's Reply Memorandum at 5. True, Rule 6(e) does not insulate from disclosure all information presented to grand juries, but clearly the

> aim of the rule *is* to prevent disclosure of the way in which information was presented to the grand jury, the specific questions and inquiries of the grand jury, the deliberations and vote of the grand jury, the targets upon which the grand jury's suspicion focuses, and specific details of what took place before the grand jury.

*In re Grand Investigation of Ven Fuel*, 441 F.Supp. 1299, 1302–03 (M.D.Fla.1977). This information is exactly what defendant seeks.

Additionally, rather than showing how his ability to prepare his defense would be unfairly prejudiced or impeded without this information, *United States v. Proctor & Gamble*, 356 U.S. at 682, 78 S.Ct. at 986, defendant's assertions are little more than

> a general broadside attack against Grand Jury secrecy and the indictment system. It [is] not a specific and factually based showing of a need particularly related to the defense of the case. The desire to inspect the transcripts for possible use as an impeachment tool at trial is an unjustified attempt to obtain "an extraordinary source of discovery".

*United States v. Frumento*, 405 F.Supp. 23, 33 (E.D.Pa.1975), citing *United States v. Jaskiewicz*, 272 F.Supp. 214, 216 (E.D.Pa.

---

**13.** We cannot here conclude that the omission, even if known at the time that the indictment was presented to the grand jury, was a wilful

and blatant use of perjured testimony on a material aspect of the indictment.

1967). Basically, defendant claims that the grand jury delivered the indictment without sufficient legal evidence. However, once a grand jury returns a true bill, no independent inquiry may be made to determine the kind of evidence considered by the grand jury in making its decision. *United States v. Basurto,* 497 F.2d at 785, *United States v. Nomura Trading Co.,* 213 F.Supp. 704, 706 (S.D.N.Y.1963). A general desire, like defendant's, to ferret out projected improprieties and to demonstrate insufficiency of evidence will be present whenever a grand jury indicts. *Smith v. United States,* 423 U.S. at 1304, 96 S.Ct. at 3, *Costello v. United States,* 350 U.S. at 363, 76 S.Ct. at 408. To consider defendant's proposed offer a sufficient showing of particularized need will make disclosure of grand jury notes of testimony a routine matter. Whether the government lacks evidence to support the charges contained in the indictment is a matter to be resolved at trial. *United States v. Fineman,* 434 F.Supp. at 196.

Finally, a determination of probable cause by a grand jury rather than a magistrate during a preliminary examination furnishes no basis for inspection of grand jury notes of testimony. *United States v. Frumento,* 405 F.Supp. at 33. Accordingly, defendant's motion will be denied.